# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-3917 & 09-1321

MATRIX IV, INCORPORATED,
an Illinois Corporation,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

AMERICAN NATIONAL BANK AND
TRUST COMPANY OF CHICAGO,
an Illinois Banking Association,

*Defendant-Appellee,*

and

GATEWAY PARK, an Illinois
Limited Liability Company,

*Defendant-Appellee/*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 1661—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED APRIL 19, 2010—DECIDED JULY 28, 2011

Before BAUER and SYKES, *Circuit Judges*, and GRIESBACH, *District Judge*.*

SYKES, *Circuit Judge*. This appeal raises questions about the preclusive effect of judgments rendered by a bankruptcy court on later litigation between creditors and a company affiliated with the debtor. Matrix IV, Inc. ("Matrix"), a plastics manufacturer, sued American National Bank and Trust Company of Chicago ("ANB")[1] and Gateway Park LLC ("Gateway") alleging claims for violation of RICO and common-law fraud. The dispute traces its roots to Matrix's dealings with S.M. Acquisition Co., a plastic-container company that did business under the name "Stylemaster, Inc." and filed for bankruptcy in 2002. The bankruptcy was lengthy and complex. Matrix filed a creditor's claim for more than $7 million, and during the course of the proceedings, lodged a strenuous objection to the proposed sale of Stylemaster's assets and was also party to an adversary proceeding to resolve a lien-priority dispute with ANB. Matrix was one of Stylemaster's suppliers and had a lien on certain Stylemaster inventory in its possession; ANB was Stylemaster's primary lender, and Stylemaster had

---

* The Honorable William C. Griesbach, United States District Court for the Eastern District of Wisconsin, sitting by designation.

[1] American National Bank and Trust Company of Chicago is now part of JP Morgan Chase Bank, N.A. ("Chase"), and is represented in this action by counsel for Chase. We follow the district court's lead in referring to this party as ANB.

pledged all of its assets as security for a line of credit with ANB.

In opposing the proposed asset sale, Matrix alleged that Stylemaster (and by extension Gateway, a related company) had fraudulently induced it to produce plastic storage containers without any intention of paying for them. The object of this scheme, according to Matrix, was to build up Stylemaster's inventory so that a successor company led by Stylemaster insiders could purchase the company's assets at a firesale price in the bankruptcy. The lien-priority adversary proceeding centered on similar allegations; Matrix claimed that ANB's lien should be equitably subordinated to its own because ANB participated in the fraud by lending Stylemaster money and conspiring to destroy Matrix's lien.

Matrix's fraud allegations failed at all levels of the bankruptcy proceeding—in the bankruptcy court, the district court, and on appeal in our court. Matrix has now repackaged those failed allegations into this RICO and common-law fraud action. The district court dismissed the suit on grounds of res judicata and collateral estoppel, concluding that Matrix had litigated and lost the very same fraud claims in the bankruptcy proceeding. Gateway then moved for Rule 11 sanctions; the district court denied this motion. Matrix appealed the dismissal order, and Gateway has cross-appealed from the denial of its Rule 11 motion.

We affirm the district court's order of dismissal, although on narrower grounds. As we will explain, the res judicata argument exposes some tension in our

caselaw and a lopsided circuit split on how claim preclusion applies in this context. The Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), suggests that resolving the conflict may be a bit more complicated than the caselaw presently admits. Because collateral estoppel—issue preclusion—blocks this new suit in its entirety, we affirm on this narrower ground of decision and leave the resolution of the conflict for a future case in which it will actually matter.

We also affirm the district court's denial of Rule 11 sanctions. Based on the conflict in our caselaw, we cannot say that Matrix's RICO and common-law fraud claims were frivolous or designed to harass.

## I. Background

### A. Origin of the Dispute

As the foregoing summary suggests, this dispute has a complicated factual and procedural history spanning many years. Because this appeal presents preclusion issues, we cannot avoid describing the history in some detail; we will simplify where we can. Stylemaster was and Matrix continues to be in the molded-plastics industry. Starting in 1994, Stylemaster bought plastic injection molds from an outside vendor and had them shipped directly to Matrix. Matrix fashioned the molds into plastic storage containers for Stylemaster (think the long plastic storage bins that slide under beds), which in turn distributed the containers to big-box retailers like Kmart and Target. Over time, Stylemaster had difficulty paying

Matrix's invoices and the relationship soured. As of November 1997, Matrix claimed that Stylemaster owed it approximately $2.4 million. The two companies negotiated a solution whereby Matrix claimed a first-priority lien over the molds in its possession and promised to supply Stylemaster with storage containers in the upcoming years in exchange for Stylemaster's promise to pay Matrix's outstanding invoices. Stylemaster paid Matrix's pre-November 1997 invoices in 1999, and by 2002 had paid all invoices dated prior to July 2001. Whether this extinguished Matrix's lien would become a subject of debate in the bankruptcy.

Also in 1997 Stylemaster entered into a loan agreement with its primary lender ANB. To secure a credit line with the bank—something that it had trouble doing given its shaky finances—Stylemaster pledged all of its assets and property as security. ANB filed a Uniform Commercial Code financing statement with the Illinois Secretary of State on the same day the agreement was executed. The loan agreement was modified several times and in 2001 was amended to include Stylemaster's assets and property "wherever located." In the bankruptcy court, Matrix claimed that this amendment was an attempt to usurp its lien over the Stylemaster molds in its possession.

In 1998 Stylemaster's principals formed Gateway Park LLC ("Gateway"), which negotiated with the City of Chicago to build an industrial park on the city's southwest side. Stylemaster told Matrix that after it moved into this new industrial space, it would need an even

greater supply of plastics. Matrix dubs this the "Greater Gateway Scheme" and claims that Stylemaster sought to build up its inventory in order to increase its line of credit with ANB and then use the larger credit line to move its plastics manufacturing in-house. To carry out this scheme, Matrix says, Stylemaster delayed payment to suppliers and sought to destroy the suppliers' possessory liens over the plastic molds. The plan was for Stylemaster to file for bankruptcy, and thereafter its principals would form a successor company that would buy Stylemaster's assets at a firesale price. According to Matrix, ANB participated in this scheme by loaning Stylemaster money in exchange for a lien over the plastic molds in Matrix's possession.

Matrix claims that the fraud began in earnest in 2001, when Stylemaster allegedly placed a series of large, out-of-the-ordinary orders with Matrix. When Matrix inquired about the source of the orders, Stylemaster responded that it had plenty of storage space at its Gateway facility and that many of the orders were for big retailers like Kmart. Kmart apparently cancelled its orders with Stylemaster in December 2001, but Stylemaster demanded that Matrix continue to supply it on an expedited basis. Stylemaster again became delinquent in its payments, and Matrix extended it trade credit to fill the orders. In 2002 Matrix sued Stylemaster in Illinois state court for breach of contract based on the payment delinquencies.

## B.  Bankruptcy Proceedings

Less than a month after this state-court contract action was filed, Stylemaster filed for bankruptcy under Chapter 11. Matrix submitted a claim contending that Stylemaster owed it approximately $7.2 million,[1] and ANB claimed it was owed approximately $9.6 million. Shortly after the bankruptcy filing, the owners of Stylemaster formed a new company J.R. Plastics, which after full disclosure as an insider buyer, purchased Stylemaster's assets at a judicially approved bankruptcy sale under § 363 of the Bankruptcy Code. As part of the bankruptcy settlement, ANB agreed to assign its secured interest and lien over the molds in Matrix's possession to J.R. Plastics.

Before approving the sale, the bankruptcy court held a three-day evidentiary hearing to determine whether the sale should proceed. *See* 11 U.S.C. § 363(b) (generally requiring notice and a hearing prior to a sale in bankruptcy of assets or property of the estate). Matrix filed an objection to the sale on the ground that it had a lien on plastic molds in its possession that Stylemaster was claiming as assets and that its lien should have priority over ANB's lien. Matrix also filed a motion to dismiss the bankruptcy petition or convert the Chapter 11 case

---

[1] Shortly after Stylemaster's bankruptcy filing, Matrix also filed a complaint in district court against Stylemaster's shareholders alleging common-law fraud and RICO violations. *See Matrix v. Williams*, No. 02 C 05609 (N.D. Ill. filed Aug. 7, 2002). The factual allegations in that complaint are similar to the schemes alleged in this case.

to a Chapter 7 case. The basis for the motion was that Stylemaster had engaged in "significant acts of fraud, dishonesty, incompetence and/or gross mismanagement" and "intentionally and fraudulently induced Matrix IV to produce and ship it goods with no intention of paying for those goods." The motion also alleged that Stylemaster had misrepresented that the large, expedited orders were from Kmart when they actually went directly into Stylemaster's inventory.

Without ruling on the motion to dismiss, the bankruptcy court ordered the auction sale to proceed and set a date for filing written objections to the sale. Matrix filed another objection, arguing that Stylemaster, by not properly disclosing its assets, had discouraged potential bidders and given an unfair advantage to J.R. Plastics, an insider, in the bidding process. The bankruptcy court issued an order approving the sale, permitting the debtor to assign a lien to J.R. Plastics, and finding that J.R. Plastics was a good-faith purchaser. This order also specified that ANB held a first perfected priority lien on all of Stylemaster's assets except the lien contested by Matrix.

Matrix did not appeal this order but instead filed a motion to reconsider. In this motion Matrix again argued that Stylemaster and J.R. Plastics were "engaged in an unlawful and fraudulent scheme whereby they induced Matrix to deliver goods to Debtor even though defendants had no intention of paying for the goods." Matrix alleged that Stylemaster's principals planned to stockpile inventory, put Stylemaster into bankruptcy, and then purchase the inventory "under the guise of a new

corporate entity (JR Plastics)" for a "fraction of market value."

The bankruptcy court held a hearing on the motion for reconsideration, which the court construed as a request for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure and its bankruptcy equivalent, Rule 9024 of the Federal Rules of Bankruptcy Procedure. Matrix reiterated its fraud argument and noted that the bankruptcy court had not made a specific finding of fact that J.R. Plastics was a good-faith purchaser. The bankruptcy judge explained that he had previously given the parties an opportunity to offer evidence of fraud at the original hearing and asked if Matrix was seeking to offer new or additional evidence. Matrix said it had no further evidence to offer. The bankruptcy judge then recounted Matrix's allegations in some detail and found that there was no evidence to support the claim of fraud or collusion in the sale process. The court also entered a specific finding that J.R. Plastics was a good-faith purchaser. The court concluded that Matrix's claim of fraud and collusion was "unwarranted and frivolous" and did not have "one breath of merit." Matrix did not appeal this ruling to the district court.

Although the asset sale was approved, the lien-priority dispute between Matrix and ANB remained. ANB commenced an adversary proceeding seeking a declaration that its lien had priority over Matrix's lien and cor-

responding injunctive relief.[2] ANB eventually moved for summary judgment, to which Matrix responded by repeating its allegations of fraud, arguing that ANB's lien should be equitably subordinated to its own. Matrix alleged that ANB had extended credit to Stylemaster despite knowing that Stylemaster was insolvent; ANB intentionally disregarded Matrix's lien; ANB failed to investigate and resolve Matrix's potential lien; and ANB conspired with Stylemaster to destroy Matrix's lien. The judge denied ANB's motion for summary judgment. Thereafter, ANB complained to the court that Matrix had failed to properly plead its equitable-subordination defense. The judge then ordered Matrix to assert its equitable-subordination claim as an affirmative defense.

Matrix complied with this order by submitting a more definite statement of facts purporting to establish its now-familiar claim of fraud: Stylemaster was not paying Matrix for its orders; Stylemaster assured Matrix of the superiority of its lien; ANB had knowledge of Matrix's lien or at least should have conducted a reasonable investigation to discover the lien; and ANB and Stylemaster conspired to amend their loan agreement to include a lien on molds in Matrix's possession but never apprised Matrix of this change. After a full trial, the

---

[2] Another adversary proceeding sought return of the molds in Matrix's possession, in addition to other inventory. In response Matrix filed a counterclaim alleging that Stylemaster was engaged in an "unlawful and fraudulent scheme" to "induce[] Matrix into delivering goods to Stylemaster even though defendants had no intention of paying for the Goods."

bankruptcy judge held in an oral ruling that ANB's lien had priority over Matrix's lien. *See In re S.M. Acquisition Co.*, 296 B.R. 452 (Bankr. N.D. Ill. 2003). The judge found that Stylemaster's payments through 2001 had extinguished Matrix's lien and that any post-2001 lien was subordinate to ANB's UCC lien. *Id.* at 470-71. On appeal the district court affirmed, but remanded with instructions to the bankruptcy court to issue a formal order on Matrix's equitable-subordination claim; although it was implicit in its oral ruling, the bankruptcy judge had never formally rejected Matrix's equitable-subordination affirmative defense.

On remand the bankruptcy court formally ruled on the equitable-subordination defense, holding that Matrix had insufficient evidence to support a finding of fraud. *In re S.M. Acquisition Co.*, 332 B.R. 346 (Bankr. N.D. Ill. 2005). The court rejected Matrix's argument that ANB had ignored Stylemaster's financial problems and failed to conduct reasonable due diligence to unearth Matrix's competing lien, and found that the evidence established that ANB had only "ordinary business purposes" in its relationship with Stylemaster. *Id.* at 356. Matrix appealed this ruling, and the district court affirmed. *In re S.M. Acquisition Co.*, No. 05 C 7076, 2006 WL 2290990 (N.D. Ill. Aug. 7, 2006). The district court held that Matrix's equitable-subordination defense was inadequate and could not withstand a Rule 12(b)(6) challenge. *Id.* at *4. The court said the fraud claim was "patently defective" and that ANB's conduct was not unfair or inequitable. *Id.* The court went on to state:

Although Matrix initially suggested in the summary judgment briefing that the Bank participated in Stylemaster's fraud, the [more definite statement] contains no allegation that the Bank acted unfairly or used its insider status to deliberately mislead other creditors about the financial position of Stylemaster or its own security interests. Accordingly, Matrix failed to allege inequitable conduct by the Bank that, as a matter of law, could entitle it to the extra-ordinary remedy of equitable subordination. Because Matrix thus could not prove any set of facts in support of its defense, the bankruptcy court did not err in striking the equitable subordination defense.

*Id.* at *8.

Matrix ultimately filed consolidated appeals in this court asking that all prior judgments be vacated. We summarily affirmed. The bankruptcy plan was eventually confirmed, and a final decree was entered.

## C. The Present Suit

While the bankruptcy proceedings were still ongoing, Matrix filed this suit against ANB and Gateway alleging claims for violation of RICO and common-law fraud. The complaint was initially dismissed on the ground that Matrix had not pleaded any misrepresentations by ANB or Gateway and had failed to allege activities that constituted a RICO enterprise. Matrix was given leave to amend and did so. The allegations in the amended complaint were again familiar: ANB and

Gateway schemed to defraud Matrix by building up Stylemaster's inventory, refusing to pay Matrix's invoices, and ultimately allowing J.R. Plastics to buy Stylemaster's inventory at a firesale price; ANB and Stylemaster (and by extension, Gateway) concealed the fact that ANB had acquired a superior lien over Matrix's molds; Stylemaster falsely represented that Matrix's lien would be superior to any subsequent liens; ANB knew that Stylemaster was insolvent but still gave Stylemaster a line of credit; and ANB had knowledge of Matrix's lien and failed to conduct a reasonable investigation of outstanding liens. For predicate racketeering acts, the amended complaint pointed to letters ANB sent to Stylemaster in servicing the loans and also identified certain acts committed in the course of the bankruptcy litigation that it alleged were a fraud on the court.

Gateway moved to dismiss the amended complaint, relying on res judicata and collateral estoppel (among other arguments). By this time the case had been transferred to a different district judge who denied the motion. Gateway filed a motion to reconsider, pointing out that the court had not addressed the res judicata and collateral-estoppel arguments. In the meantime ANB moved for judgment on the pleadings, also invoking res judicata and collateral estoppel (among other arguments). The district court granted the motion to reconsider and ultimately entered judgment on the pleadings dismissing the suit on both res judicata and collateral-estoppel grounds. The court explained that Matrix's RICO and common-law fraud claims were compulsory counterclaims that could

have and should have been brought in the bankruptcy proceedings.

Gateway then moved for Rule 11 sanctions. Matrix moved to strike the motion, alleging that Gateway had not complied with the notice requirements of Federal Rule of Civil Procedure 11(c)(2). Gateway filed a reply, submitting a letter it sent to Matrix's counsel less than two weeks after the complaint was filed. In the letter Gateway's counsel advised Matrix that its claims were barred by the final judgment in the bankruptcy proceedings and that Gateway would seek sanctions if Matrix did not withdraw it and the suit was later dismissed. The district court denied the motion for sanctions.

Matrix appealed the court's order of dismissal. Gateway filed a cross-appeal from the denial of its Rule 11 motion. In its brief Gateway asked for frivolous-appeal sanctions under Rule 38 of the Federal Rules of Appellate Procedure.

## II. Discussion

We review an order granting a Rule 12(c) motion for judgment on the pleadings de novo, taking the facts alleged in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The dismissal of this suit on res judicata and collateral-estoppel grounds raises questions of law that we review de novo. *Tartt v. Nw. Cmty. Hosp.*, 453 F.3d 817, 822 (7th Cir. 2006).

The doctrine of "[r]es judicata bars not only those issues actually decided in the prior suit, but all other issues which could have been brought." *Aaron v. Mahl*, 550 F.3d 659, 664 (7th Cir. 2008). The principle underlying res judicata—or claim preclusion—is to minimize "the expense and vexation attending multiple lawsuits, conserve[] judicial resources, and foster[] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-54 (1979). Res judicata has three elements: "(1) an identity of the parties or their privies; (2) [an] identity of the cause of action; and (3) a final judgment on the merits." *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008). Here, Matrix only challenges the second and third elements; there is no dispute that the parties are the same.[3]

The second element—whether an "identity of the cause of action" exists—depends on whether the claims arise out of the same set of operative facts or the same transaction. *In re Energy Coop., Inc.*, 814 F.2d 1226, 1230 (7th Cir. 1987). This "transactional" inquiry focuses on whether the claims comprise the same "core of operative facts [that] give rise to a remedy." *Id.* (quotation marks omitted). Even if the two claims are based on different legal theories, the "two claims are one for purposes of

---

[3] Matrix and ANB participated as creditors in the bankruptcy proceeding and were parties to the lien-priority adversary proceeding within the bankruptcy. Everyone agrees that Gateway was effectively a party as well, based on the identity of its ownership with that of Stylemaster and J.R. Plastics.

res judicata if they are based on the same, or nearly the same, factual allegations." *Herrmann v. Cencom Cable Assocs.*, 999 F.2d 223, 226 (7th Cir. 1993).

The doctrine of collateral estoppel—issue preclusion—is narrower. For collateral estoppel to apply, "(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007) (quotation marks omitted).

We start by noting our general agreement with the district court that the claims Matrix advances in this case are based on the same core of operative facts as the claims it litigated and lost in the bankruptcy proceedings. It makes no difference that the earlier claims took a different form—that is, an equitable-subordination defense in the lien-priority adversary proceeding and an objection to the bankruptcy asset sale on the ground that J.R. Plastics was not a good-faith purchaser. It's quite clear that the allegations of fraud Matrix asserted in the Stylemaster bankruptcy are the same basic allegations it makes here: (1) Stylemaster built up its inventory with goods from Matrix that it had no intention of paying for; (2) its principals formed a new corporate entity, J.R. Plastics, to buy Stylemaster's assets at a reduced price in a bankruptcy sale; (3) Stylemaster arranged a line of credit with ANB secured by Style-

master's unpaid-for inventory; and (4) Stylemaster and ANB conspired to establish the priority of ANB's lien over Matrix's. Under well-established claim-preclusion doctrine, this common nucleus of operative facts means the claims are the same even though they involve different legal theories. *See Alvear-Velez*, 540 F.3d at 677 (holding that a "claim" consists of the underlying factual events rather than the legal theories advanced).

Matrix insists that the claims cannot be the same because the alleged RICO conspiracy includes events subsequent to Stylemaster's bankruptcy filing. More specifically, Matrix asserts that ANB committed a fraud on the bankruptcy court by pursuing a claim for which it did not have standing. A question relating to ANB's standing in the bankruptcy proceeding cannot form the basis of an otherwise impermissible collateral attack on the judgments rendered by the bankruptcy court. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not . . . reopen that question in a collateral attack upon an adverse judgment."). Moreover, only a few of the allegations in the amended complaint pertain to events that occurred during the bankruptcy proceeding; they do not suffice to destroy the essential factual commonality of these claims. Nearly all the facts comprising the alleged fraudulent scheme predate Stylemaster's bankruptcy filing; without the alleged prebankruptcy scheme, Matrix has no RICO or common-law fraud claim.

Matrix also contends, quite implausibly, that it never actually pleaded fraud in its opposition to the bankruptcy sale or in the adversary proceeding. Matrix claims that because it withdrew its motion to dismiss the bankruptcy case and removed the mention of "fraud" from its supplemental statement of facts in support of equitable subordination, the present allegations of conspiracy to defraud were never put before the bankruptcy court. This is hardly an accurate representation of the bankruptcy proceedings. Even accepting the proposition that the withdrawal of the motion to dismiss and the recharacterization of the equitable-subordination defense took some of the fraud allegations off the table, it is abundantly clear that Matrix doggedly pursued its claim of fraud throughout the bankruptcy proceedings. Matrix's objection to the asset sale and its equitable-subordination defense in the lien-priority proceeding turned entirely on allegations that a fraudulent scheme was afoot. More fundamentally, Matrix's argument ignores that identity of claims for res judicata purposes has nothing to do with legal theories; the key is that the claims arise from the same core of operative facts. Matrix's equitable-subordination defense in the lien priority proceeding rested on the same fraud allegations Matrix raised and lost in its objection to the § 363 sale; in turn, these same allegations form the basis of the RICO and fraud claims asserted here.

Finally, there can be little doubt that the bankruptcy court rendered final judgments on the merits. The bankruptcy orders confirming the asset sale under § 363 and dismissing the equitable-subordination defense in

the lien-priority adversary proceeding—orders affirmed by the district court and this court—were final orders. Matrix maintains that these orders did not dispose of its fraud claim on the merits. We disagree. As we have explained, the heart of Matrix's request that the bankruptcy court reconsider its approval of the asset sale was a contention that Stylemaster and J.R. Plastics participated in an inventory-buildup fraud, the purpose of which was to permit J.R. Plastics to purchase Stylemaster's assets for a fraction of their value. The bankruptcy court held a hearing on the motion, rejected Matrix's allegations of fraud, held that J.R. Plastics was a good-faith purchaser, and permitted the sale to proceed. That was a merits determination.

And Matrix had another full airing of its fraud claim when it raised—and lost—its equitable-subordination defense in the lien-priority adversary proceeding. The bankruptcy court, first orally and in a later written opinion, held that ANB had not engaged in any inequitable or unfair conduct. *See In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008) ("Equitable subordination allows the bankruptcy court to reprioritize a claim if it determines that the claimant is guilty of *misconduct that injures other creditors or confers an unfair advantage on the claimant*." (emphasis added)). The district court affirmed this ruling after scouring the record for evidence of collusive or unfair dealings and finding none. The lack of evidence of fraud means that the defense was meritless, not that it was never litigated on the merits.

So the elements of claim preclusion are established. This conclusion finds direct support in our caselaw.

We held in *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1018
(7th Cir. 1988), that a bankruptcy trustee was barred
from filing a RICO suit against the debtor and others
involved in a bankruptcy asset sale after the sale had
been confirmed; res judicata applied because the suit
was a "thinly disguised collateral attack on the [bank-
ruptcy court's] judgment confirming the sale." "RICO is
many things," we explained, "but it is not an exception
to res judicata." *Id.* at 1016. And in *Crop-Maker Soil
Services v. Fairmount State Bank*, 881 F.2d 436, 440 (7th Cir.
1989), we concluded that a fraud claim brought in
district court in connection with a lien over a tomato
crop was barred by res judicata because the plaintiff
had failed to raise the issue in earlier lien-priority pro-
ceedings in the bankruptcy court. We held that the plain-
tiff's failure to raise the fraud arguments in bankruptcy
court, "whether strategic or inadvertent, will not enable
Crop-Maker to escape the res judicata net." *Id.* at 439.

Normally we could conclude our opinion and affirm
the district court without further ado; the elements of
claim preclusion are established, and there is circuit
precedent for applying it here. But a pronounced conflict
in our caselaw on this issue gives us reason to pause. In
*Barnett v. Stern*, 909 F.2d 973 (7th Cir. 1990), a bankruptcy
trustee brought a RICO claim in district court based
on a fraudulent transaction that had been the subject of
an adversary action in the bankruptcy proceedings. In
an attempt to outmaneuver his creditors, the debtor had
formed a sham third-party trust, naming his son as
trustee. *Id.* at 975. The bankruptcy trustee filed an adver-
sary action to recover the assets held in the trust; he

claimed the trust was the alter ego of the debtor and its assets belonged to the bankruptcy estate. The bankruptcy court agreed and ordered the bankruptcy trustee to take control of the assets in the third-party trust. *Id.* The bankruptcy trustee later filed a RICO suit in district court against the debtor's son for his part in the fraudulent scheme. *Id.* at 975-76. The district court held that the suit was barred by res judicata, but we reversed. *Id.* at 978-82.

*Barnett's* holding was grounded on an analysis of the interplay between claim-preclusion principles and the bankruptcy court's authority to render final judgments. To explain *Barnett* thus requires a short detour into the bankruptcy court's jurisdiction. The Bankruptcy Code provides that "[b]ankruptcy judges may hear and enter final judgments in 'all core proceedings arising under title 11, or arising in a case under title 11.'" *Stern*, 131 S. Ct. at 2604 (quoting 28 U.S.C. § 157(b)(1)). Section 157(b)(2) provides a nonexhaustive list of "core" proceedings; as relevant here, these include "determinations of the validity, extent, or priority of liens" and "orders approving the sale of property." *See* 28 U.S.C. § 157(b)(2)(K), (N). Bankruptcy courts may also hear actions that are "related to" core proceedings but cannot resolve these "noncore" proceedings unless all parties consent. *Id.* § 157(c)(1), (2). Absent the parties' consent, in noncore proceedings the bankruptcy court is limited to making proposed findings of fact and conclusions of law to the district court, and the district court may enter a final judgment after considering those findings and conclusions de novo. *Id.* § 157(c)(1).

*Barnett* relied heavily on *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183 (5th Cir. 1990), in which the Fifth Circuit reasoned that because a bankruptcy court could not by itself adjudicate a noncore claim to finality under § 157(c)(1), a party to a noncore proceeding would not have a "full and fair" opportunity to litigate the claim for purposes of res judicata. 909 F.2d at 978-80. *Barnett* adopted the Fifth Circuit's reasoning and held that a bankruptcy court's resolution of a core claim will not have res judicata effect on a noncore claim that could have been brought, but wasn't, under the court's "related" jurisdiction. *Id.* at 981-82. *Barnett* further held that the trustee's RICO claim was a noncore proceeding, and the bankruptcy court's adjudication of the adversary proceeding to recover the assets in the sham trust— a core proceeding—did not have res judicata effect on the later noncore RICO claim. *Id.* at 980-82. This was so even though the claims arose out of the same transaction and operative facts. *Id.*

It's hard to distinguish *Barnett* from this case. Like the alter-ego adversary proceeding in *Barnett*, the asset-sale confirmation and lien-priority adversary proceedings were core bankruptcy proceedings. *Barnett* holds that a later-filed RICO claim is noncore and therefore not barred by res judicata. Curiously, *Barnett* did not mention *Met-L-Wood* or *Crop-Maker*, even though its holding would have dictated a different result in *Met-L-Wood* and possibly *Crop-Maker* as well if it was determined that the fraud claim in that case would have been a noncore proceeding in the bankruptcy. Moreover, since *Barnett* our circuit has continued to apply res judicata in the bank-

ruptcy context without reference to the core/noncore distinction. *See, e.g., ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 930-31 (7th Cir. 2003) (barring subsequent copyright-infringement claim for debtor's failure to raise claim in bankruptcy proceeding); *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir. 2000) (remarking without mention of *Barnett* or noncore claims that as a "general rule" bankruptcy orders are res judicata in subsequent proceedings); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 908-09 (7th Cir. 1990) (finding tort and contract claims to be barred by prior bankruptcy judgment sale, without reference to *Barnett*'s core/noncore distinction). Only one of our cases discusses *Barnett* at all, and it held that the *Barnett* core/noncore argument had been waived and also distinguished the decision on its facts. *See In re Kroner*, 953 F.2d 317, 320 (7th Cir. 1992). Despite *Met-L-Wood* and *Crop-Maker*, our opinion in *Kroner* said *Barnett* neither "created new law" nor "purported to overturn prior precedent." *Id.* at 319.

Finally, we note as well that every other circuit to have addressed this issue since *Barnett* has rejected the core/noncore distinction for purposes of deciding the claim-preclusive effect of judgments entered in bankruptcy proceedings. *See Plotner v. AT & T Corp.*, 224 F.3d 1161, 1173-74 (10th Cir. 2000); *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999); *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969-70 (9th Cir. 1994); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474 (6th Cir. 1992); *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991). Even the Fifth

Circuit, whose decision in *Howell Hydrocarbons* formed the basis of the reasoning in *Barnett*, has cast doubt on the continuing vitality of the distinction. *See Matter of Baudoin*, 981 F.2d 736, 741 n.10 (5th Cir. 1993) (remarking in dictum that it was not certain that "bankruptcy jurisdiction must always be core in order to be 'competent' for *res judicata* purposes").

The existence of both an intra- and inter-circuit conflict provides reason to revisit *Barnett*'s conclusion that the distinction between core and noncore proceedings makes a dispositive difference in claim-preclusion analysis. The jurisdictional point under § 157(b) and (c) is clear, but the allocation of jurisdiction between the bankruptcy and district courts does not speak to a party's ability to receive a final judgment in a bankruptcy proceeding; rather, it stipulates which court has the authority to render the judgment. The Supreme Court's recent decision in *Stern* explains the statutory and constitutional dimensions of the jurisdiction-allocation question. 131 S. Ct. at 2608-11.

The question before the Court in *Stern* was whether Article III permits the bankruptcy courts to hear and finally decide a particular type of core proceeding. Under § 157(b)(2)(C), "counterclaims by the estate against persons filing claims against the estate" are specifically denominated as core proceedings. The counterclaim at issue in *Stern* was a state common-law tort claim by the estate for intentional interference with a testamentary gift. *Id.* at 2601-02. The Court held that although Congress had, in § 157(b)(2)(c), designated this kind of claim as "core," Article III did not permit the bank-

ruptcy court to hear and finally decide it. *Id.* at 2608. That is, Congress could not delegate to a non-Article III court the judicial power "to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620.

As we have noted, *Barnett* keyed the claim-preclusive effect of bankruptcy-court orders to the core/noncore distinction, but the parties have not submitted Rule 28(j) letters on the effect of *Stern* on our reasoning in *Barnett*. As a general rule, resolving a conflict in circuit caselaw ought to be attempted only on full briefing and in a case in which the outcome depends on it. Because a narrower ground exists on which to resolve this case, we leave the resolution of the conflict for another day. By its terms, *Barnett* does not apply to collateral estoppel, 909 F.2d at 978 n.5, and here, the elements of collateral estoppel have plainly been satisfied. For the reasons we have already explained, the fraud allegations at issue in this case are the same as those that were *actually litigated* in the § 363 hearing and in the lien-priority adversary proceeding. The bankruptcy court was required to and did address them before entering its orders in those proceedings. Finally, Matrix was fully represented in the bankruptcy proceedings. Accordingly, Matrix is collaterally estopped from relitigating the very same issues here.

## C. Sanctions

Gateway appealed the district court's denial of its motion for sanctions pursuant to Rule 11, a decision that

we review for abuse of discretion. *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 868 (7th Cir. 2009). Before taking up the merits of Gateway's argument for sanctions, we address certain concerns raised below and reiterated here that the motion for sanctions was procedurally defective. Rule 11(c)(2) provides that a motion for sanctions must be served on the opposing party, but that it cannot be filed with the court until 21 days have passed from the date of service of the motion. This 21-day window gives the offending party a "safe harbor" within which to withdraw or correct the offending pleading.

Matrix argues that Gateway failed to comply with the safe-harbor provision by not providing sufficient notice of its motion for sanctions. It also claims that motions for Rule 11 sanctions filed after a final judgment, like the one at issue here, are not permissible. Matrix is incorrect on both points. Gateway put Matrix on notice of its intent to seek sanctions by a letter sent two weeks after Matrix filed its initial complaint. In this letter Gateway noted that "[i]n light of the judgment in the bankruptcy matter and the failure to allege any involvement by Gateway Park, LLC," filing the new claims was sanctionable under Rule 11. Gateway told Matrix it would seek sanctions if Matrix did not voluntarily dismiss the complaint and that the letter served "as notice of [its] intention to seek sanctions if and when the counts against Gateway Park, LLC are dismissed."[4]

---

[4] We have said that the notice of Rule 11 sanctions must "describe the specific conduct that is alleged to violate

(continued...)

More than two years later, the district court dismissed the case, and as promised, Gateway filed for Rule 11 sanctions 23 days after the dismissal.

The 21-day window specified in Rule 11 is a floor, not a ceiling, as Matrix seems to suggest. That Matrix had much more "safe harbor" time before the Rule 11 motion was filed only underscores the fact that it had sufficient opportunity to decide whether to dismiss its suit in response to Gateway's notice. Moreover, we have held that a letter informing the opposing party of the intent to seek sanctions and the basis for the imposition of sanctions—like the one Gateway sent in this case—is sufficient for Rule 11 purposes. *See, e.g.*, *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (finding a letter informing offending party of sanctions to be adequate); *Nisenbaum v. Milwaukee Cnty.*, 333 F.3d 804, 808 (7th Cir. 2003) (same). That Gateway filed its motion for sanctions 23 days after the district court dismissed the suit—and more than two years after the Rule 11 notice letter was sent—does not mean that the

---

[4] (...continued)
Rule 11(b)." *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1012 (7th Cir. 2004). In determining whether this standard has been satisfied, we do not disregard context. Gateway's letter did not mention res judicata or claim preclusion explicitly, but the phrase "[i]n light of the judgment in the bankruptcy matter" makes it clear that Gateway would argue preclusion. This inference is reinforced by the fact that Matrix's attorneys had already been fighting Gateway's preclusion defenses in the shareholder litigation.

requirements of Rule 11 have not been satisfied. Postjudgment motions for sanctions are permissible so long as the moving party substantially complies with Rule 11's safe-harbor requirement, as Gateway did here. *See Divane v. Krull Elec. Co.,* 200 F.3d 1020, 1025 (7th Cir. 1999). Finally, we have recognized that the "outer parameters" for filing motions for sanctions after final judgment is 90 days. *Sullivan v. Hunt*, 350 F.3d 664, 666 (7th Cir. 2003). Gateway's motion, filed within 23 days of entry of judgment, was comfortably within this postjudgment window.

Having cleared the procedural hurdles, however, we have little trouble agreeing with the district court that sanctions are unwarranted. The district court remarked that "it was not so clear cut that *res judicata* and collateral estoppel applied as to RICO and fraudulent concealment." We add only that the district court reached this conclusion without grappling with *Barnett*. When the *Barnett* complication is added to the equation, Matrix had a colorable argument that its RICO claim was not barred by the judgments in the bankruptcy proceedings. Accordingly, the district court properly denied the motion for sanctions because the claims in this suit were neither frivolous nor designed to harass or abuse.

It follows that sanctions under Federal Rule of Appellate Procedure 38 are also unwarranted. In addition, however, we note a procedural irregularity in Gateway's request for frivolous-appeal sanctions. "Before awarding such sanctions, Rule 38 requires that

either a separate motion for sanctions be filed or that we give notice that sanctions are being considered." *Greviskes v. Univs. Research Ass'n, Inc.*, 417 F.3d 752, 761 (7th Cir. 2005). Gateway asked for Rule 38 sanctions in its appellate brief, not by a separate motion.

AFFIRMED.