In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1981

ONEIDA NATION,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF HOBART,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:16-cv-01217 — **William C. Griesbach**, *Judge.*

ARGUED APRIL 13, 2020 — DECIDED JULY 30, 2020

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. The Oneida Nation's Big Apple Fest has become a test of power and jurisdiction between the Nation and the Village of Hobart, Wisconsin. The Oneida Nation in Wisconsin hosts its annual Big Apple Fest on land partially located in the Village of Hobart. In 2016 the Village demanded that the Nation obtain a permit under a Village ordinance and submit to some of the Village's laws. The Nation

sued for declaratory and injunctive relief, arguing that the Village may not subject the Nation to state and local law on its own reservation. In the meantime, the Nation held the festival without a permit, and the Village issued a citation for violating the ordinance.

To resolve this dispute, we must trace the history of the Oneida Reservation from its establishment by treaty in 1838 through a series of allotment acts passed by Congress around the turn of the twentieth century. If the Reservation remains intact, then federal law treats the land at issue as Indian country not subject to most state and local regulation. The Village argues that the Reservation was diminished piece by piece when Congress allotted the Reservation among individual tribe members and allowed the land to be sold eventually to non-Indians. The district court agreed and granted summary judgment in favor of the Village.

We reverse. The Reservation was created by treaty, and it can be diminished or disestablished only by Congress. Congress has not done either of those things. The governing legal framework—at least when the issue was decided in the district court and when we heard oral argument—was clear. Under *Solem v. Bartlett*, 465 U.S. 463 (1984), we look—from most important factor to least—to statutory text, the circumstances surrounding a statute's passage, and subsequent events for evidence of a "clear congressional purpose to diminish the reservation." *Id.* at 476. After this case was argued, the Supreme Court decided *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). We read *McGirt* as adjusting the *Solem* framework to place a greater focus on statutory text, making it even more difficult to establish the requisite congressional intent to dis-

establish or diminish a reservation. The Oneida Nation prevails under both the *Solem* framework and the adjustments made in *McGirt*.

The undisputed facts show no congressional intent to diminish. First, the statutory texts provide no clear indication that Congress intended to eliminate all tribal interests in allotted Oneida land. Second, the Supreme Court has rejected—time and time again—the Village's argument that diminishment can be the result of Congress's general expectation in the late nineteenth and early twentieth centuries that its actions would lead eventually to the end of the reservation system. These general expectations do not show an "unequivocal[]" contemporary understanding that the statutes would diminish the Reservation and effectively abrogate the United States' treaty with the Oneida. *Solem*, 465 U.S. at 471. The Village's argument that Congress intended to diminish the Reservation by allowing land to pass out of Indian hands is antithetical to *Solem* and the well-established legal framework for diminishment. Third, events following Congress's enactment of the relevant statute (or statutes) cannot alone support a finding of diminishment in the absence of textual or contextual support. Even if they could, the evidence offered by Village is so inconclusive that it could not justify a finding that the United States unilaterally broke the 1838 Treaty.

The Village's alternative arguments for affirmance also fail. The Nation is not bound by a 1933 judgment in a federal case brought by some of its individual members. And the Village has not shown "exceptional circumstances" that could justify imposing its Special Events Ordinance on the Nation within the boundaries of the Reservation. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 215 (1987). In sum, as a

matter of federal law, the entire Reservation as established by the 1838 Treaty remains Indian country. The Village lacks jurisdiction to apply its ordinance to the Nation's on-reservation activities. We remand with instructions to enter judgment in favor of the Nation.

I.  *Background*

A.  *History of the Oneida Reservation*

In 1838, the Oneida Reservation was established by treaty with the United States. Treaty with the Oneida, Feb. 3, 1838, art. 2, 7 Stat. 566. The Treaty reserved to the Oneida Tribe "a tract of land containing one hundred (100) acres, for each individual, and the lines of which shall be so run as to include all their settlements and improvements in the vicinity of Green Bay." *Id.* The Treaty called for the United States to survey land for the reservation "as soon as practicable." *Id.* art. 3. After taking a census of the Oneida, a reservation of approximately 65,000 acres was surveyed and established in compliance with the Treaty.

This Treaty was the culmination of almost two decades of relocation. The Oneida were members of the Iroquois Federation, with their homeland in New York. Like so many other tribes during the removal period (ca. 1828–1847), some of the Oneida were compelled—after years of encroachment, erosion of their land base, and pressure from both federal and state governments—to move west. This process resulted in the 1838 Treaty, in which the United States agreed to establish a reservation for the Oneida in exchange for the Oneida ceding "all their title and interest" in other land in Wisconsin that had previously been set apart for the Oneida and other New York tribes by earlier treaties. Treaty with the Oneida, art. 1,

citing Treaty with the Menominee, Feb. 8, 1831, 7 Stat. 342, and Treaty with the Menominee, Oct. 27, 1832, 7 Stat. 405.[1]

Toward the end of the nineteenth century, Congress began a nationwide policy of encouraging individual ownership of Indian reservation land. For nearly fifty years, beginning with the General Allotment Act of 1887 (also known as the Dawes Act), ch. 119, 24 Stat. 388, and ending with the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, Congress followed a policy of allotting to individual tribe members reservation lands that had been held in severalty by the respective tribes. "The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 254 (1992), citing *In re Heff*, 197 U.S. 488, 499 (1905).

The results of the allotment policy were disastrous for Indians, although the policy was driven at least in part by a paternalistic but misguided belief that forced assimilation and individual land ownership would benefit them. E.g., D.S. Otis, *The Dawes Act and the Allotment of Indian Lands* 8 (1973) (proponents of allotment believed it would "make restitution to the Indian for all that the white man had done to him in the past"), and Francis P. Prucha, *The Great Father: The United*

---

[1] The Nation submitted as evidence several expert reports describing this history in much greater detail. Frederick E. Hoxie, *A History of Relations Between the Oneida Nation and the United States of America 1776–1934*, at 23–49 (Nov. 15, 2017), ECF No. 92-2; R. David Edmunds, *The Oneida Indian Reservation in Wisconsin—Its Land, Its People, and its Governance, 1838–1938*, at 3–11 (Nov. 15, 2017), ECF No. 92-5.

*States Government and the American Indians* 895 (1984) ("primary function" of allotment was "to turn the Indians generally into agriculturalists").

The Dawes Act, enacted in 1887, was a generally applicable statute that authorized the allotment of Indian reservation lands to individual tribe members. The Act granted the President discretion to allot any Indian reservation to the members of the tribe and to issue land patents (i.e., titles) to allottees to be held in trust by the United States for twenty-five years. §§ 1, 5. After this trust period, the patents would issue in fee to the individual allottees, though the President was given discretion to extend the trust period indefinitely. § 5. After the government completed the allotment and issued the trust patents, allottees would "be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." § 6. The Dawes Act also authorized the President to negotiate with tribes whose reservations had undergone allotment for the "purchase and release" of surplus lands left over after allotment. § 5.

The Oneida Reservation in Wisconsin was allotted soon after passage of the Dawes Act. President Benjamin Harrison approved the allotment, and an agent of the Office of Indian Affairs was assigned in June 1889 to carry it out. The Reservation was split into 1,530 allotments for tribal members with 80 acres reserved for establishing schools and a small amount of land set aside for future allotments. Trust patents were issued on June 13, 1892, with fee patents set to issue to allottees twenty-five years later, in 1917.

In 1906, Congress amended Section 6 of the Dawes Act to speed the allotment process. Act of May 8, 1906 (Burke Act), ch. 2348, 34 Stat. 182. The Burke Act gave the Secretary of the

Interior the discretion to issue "a patent in fee simple," free of all restrictions, to any allottee "competent and capable of managing his or her affairs" before the expiration of the twenty-five-year trust period. 34 Stat. at 182. The Burke Act also made Indian allottees citizens subject to state law "at the expiration of the trust period" rather than upon issuance of the trust patent. *Id.* at 181. The Dawes Act, originally and as amended by the Burke Act, contained no reference to reservation boundaries, to tribal interests in reservation land, or to any particular reservation.

A month after passing the Burke Act, Congress then specifically addressed the Oneida Reservation allotments in an appropriations act for the Office of Indian Affairs. Act of June 21, 1906, ch. 3504, 34 Stat. 325, 380–81. In addition to providing appropriations and addressing other matters relevant to Indian affairs, the statute made specific adjustments to the implementation of the Dawes Act on various Indian reservations. The provisions specific to the Oneida authorized the Secretary of the Interior "in his discretion, to issue fee-simple patents" to 56 named Oneida allottees, *id.* at 380, and reiterated the authority of the Secretary to issue fee-simple patents to Oneida allottees. *Id.* at 381.

Over the next few decades, many of the Oneida Reservation allotments were fee-patented. Most of these parcels were eventually conveyed to non-Indians by sale, foreclosure, or enforcement of tax liens. *Oneida Tribe of Indians of Wis. v. Village of Hobart*, 542 F. Supp. 2d 908, 912 (E.D. Wis. 2008); see also James W. Oberly, *The Dawes Act and the Oneida Indian Reservation of Wisconsin*, in *The Oneida Indians in the Age of Allotment, 1860–1920* 194–95 (Laurence M. Hauptman & L. Gordon McLester III, eds., 2006). By 1917, only 106 Oneida allotments

remained in trust, and over 50,000 of the 65,000 acres of reservation land were owned by non-Indians.

This pattern of land loss was not unusual. Allotment "proved disastrous for the Indians." *Hodel v. Irving*, 481 U.S. 704, 707 (1987). Across the United States, the majority of reservation land left Indian hands: two-thirds of allotted land passed into non-Indian ownership, and another 60 million acres were lost under the surplus lands program. Judith Royster, *The Legacy of Allotment*, 27 Ariz. St. L.J. 1, 10–13 (1995). By the late 1920s, the policy of allotment was recognized as a failure. E.g., Lewis Meriam, Inst. for Government Research, The Problem of Indian Administration 7, 41 (1928); *Readjustment of Indian Affairs: Hearings on H.R. 7902 Before the Committee on Indian Affairs*, 73d Cong. 15 (1934) (as a result of allotment, Indians "drift[ed] toward complete impoverishment" and lost their land) (statement of John Collier, Commissioner of Office of Indian Affairs).

In 1934, federal policy toward Indian lands turned 180 degrees. Congress passed the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, not only to stem the loss of Indian land holdings brought on by allotment but also to give tribes the opportunity to re-establish their governments and land holdings. "The intent and purpose of the [Act] was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973), quoting H.R. Rep. No. 1804, at 6 (1934). The 1934 Act brought an end to allotment, indefinitely extending the trust period on all remaining trust patents. §§ 1–2. The Act allowed tribes to organize and adopt constitutions with a congressional sanction of self-government. § 16. It also authorized the

Secretary of the Interior to acquire lands to be placed into trust for tribes. § 5.

The Oneida Nation made use of this program to re-establish its tribal government and to rebuild its land base. In 1934, Oneida tribal members voted in favor of organizing under the Indian Reorganization Act. In 1936, the Oneida Constitution was approved by the Secretary of the Interior and by the Oneida themselves. Since then, the Nation has acquired in fee many of the parcels that had previously been allotted and sold to non-Indians. And as of December 2017, the United States has placed approximately 14,000 acres of land into trust for the Nation.

B.  *The Big Apple Fest*

Since 2009, the Nation has held an annual cultural event called the Big Apple Fest. The Big Apple Fest is free and open to the public. It is intended to educate the public about Oneida history and culture, and it offers a range of activities. The event is subject to the Nation's laws and regulations. Oneida Nation personnel (including police) oversee the event to ensure compliance with the Nation's ordinances pertaining to health, public safety, waste disposal, and sanitation.

The Village of Hobart is an incorporated municipality of the State of Wisconsin located entirely within the Oneida Reservation boundaries established by the 1838 Treaty. In 2016, the Village adopted its Special Event Ordinance, No. 03-2016, codified at ch. 250, Village of Hobart Municipal Code. The Ordinance applies to:

> Any temporary event or activity occurring on public or private property that interferes with or differs from the normal and ordinary use of the

> property or adjacent public or private property which, due to the number of people involved, timing of the event, or other similar factors deemed reasonably relevant by the Village, would require Village services beyond those normally provided.

*Id.* § 250-5**.** Under the Ordinance, no "person"—defined broadly enough to include the Nation—may conduct a special event within the Village without obtaining a special event permit from the Village. *Id.* §§ 250-5, 250-6. The Ordinance also imposes a range of conditions on special events and effectively imposes all relevant Village ordinances on permit holders by reserving the right to "shut down a special event that is in progress" if "there is a violation of Village ordinances, state statutes or the terms of the applicant's permit." *Id.* § 250-7(I). The Village informed the Nation that it would either have to apply for and obtain a permit for the 2016 Big Apple Fest or face a penalty under the Ordinance.

The Nation did not apply for a permit and instead conducted the 2016 Big Apple Fest under its own laws.[2] The event took place on both land held in trust for the Nation by the United States and fee land owned by the Nation and located within the Village. All of this land was within the 1838 Treaty boundaries of the Reservation.

After the 2016 Big Apple Fest, the Village issued a citation to the Nation for holding the event without a permit. The citation imposed a $5,000 fine on the Nation. The citation instructed the Nation to appear in municipal court, but those

---

[2] The Nation did obtain permission from state and county authorities to divert state highway traffic during the event.

proceedings have been stayed pending the outcome of this action.

C. *This Federal Lawsuit*

The Nation filed this action before the 2016 Big Apple Fest in response to the Village's demand that it comply with the Ordinance. The Nation sought declaratory and injunctive relief on two claims: that application of the Ordinance to the Nation is preempted by federal law and that the imposition of the Ordinance is an impermissible infringement on the Nation's power of self-government. The Village asserted several affirmative defenses and counterclaims, including for a declaratory judgment that the Ordinance was enforceable on some or all of the Nation's land. The district court allowed the Village discovery on the issues of disestablishment, diminishment, and the scope of the Big Apple Fest. It denied discovery on the Nation's status as a federally-recognized tribe under the Indian Reorganization Act, determining that recognition was a political question inappropriate for judicial review.

Following discovery, the Nation and the Village both moved for summary judgment. The district court found that the Reservation had been diminished at least to the extent that allotted land had passed into fee simple ownership and had been conveyed to non-Indians. The district court did not identify which of these two events (issuing patents to Indians or passage of title to non-Indians) actually diminished the Reservation. Nor did it identify which of the relevant statutes—the Dawes Act, the Burke Act, or the Oneida Provision of the 1906 Appropriations Act—was responsible for the diminishment of the Reservation, though its reasoning suggests that the Dawes Act alone would have been enough. The district court relied heavily on the general expectations of Congress

in the late nineteenth century regarding the future of Indian reservations. The court also assumed that Congress intended land that passed into ownership by non-Indians to lose its reservation status. Under this reasoning, the Nation would be left with a much-diminished Reservation of about 14,000 acres consisting only of its trust land.

The district court determined that the Village had the authority to impose the Ordinance on the Nation—on fee land at least—because such land did not constitute Indian country under 18 U.S.C. § 1151(a). The district court also determined that the Reservation had not been disestablished, rejecting an argument by the Village that the Nation was bound by a judgment in a 1933 suit brought by individual members of the Nation. The Nation's claims were denied, and the case was dismissed.

As explained below, the district court's decision was based on legal errors that departed from decades of Supreme Court precedent. The district court's reliance on Congress's general expectations about the decline of the reservation system was contrary to the requirement that Congress clearly express its intent to diminish a reservation. And its conclusion that fee-simple ownership—by Indians or non-Indians—was incompatible with continued reservation status is at odds with the Supreme Court's cases on diminishing reservations.

II. *Discussion*

A. *Legal Standard*

We review de novo the district court's grant of summary judgment. *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1079 (7th Cir. 2015). If the land where the Big Apple Fest takes place is Indian country, then the Oneida Nation has jurisdiction

over its own activities on its land and is not subject to regulation by the Village. See *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 & n.5 (1987) (local and state governments lack authority to regulate tribes in Indian country in absence of exceptional circumstances); *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (Indian tribes retain "attributes of sovereignty over both their members and their territory").

A federal statute defines Indian country to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, *notwithstanding the issuance of any patent*, and, including rights-of-way running through the reservation." Act of June 25, 1948, ch. 645, § 1151, 62 Stat. 757, 757, codified at 18 U.S.C. § 1151(a) (emphasis added).[3] The Village argues that this statute is not relevant and cannot be applied "retroactively" because it was enacted in 1948, after the alleged diminishment of the Oneida Reservation. "Indian country" is a statutory term of art that had a narrower meaning in the mid- to late-1800s than it currently does, limited to land to which Indian title had not been extinguished. See *Ex parte Kan-gi-Shun-ca*, 109 U.S. 556, 560 (1883), citing Act of June 30, 1834, ch. 161, § 1, 4 Stat. 729, 729.

The issue here, however, is not whether the land was "Indian country" at the time Congress passed the legislation at issue. In applying § 1151(a), we are concerned with *reservation status*, which did not and does not depend on Indian title. *United States v. Celestine*, 215 U.S. 278, 285–87 (1909). The 1948 Indian country statute codified that reservation status and

---

[3] This definition is found in the federal criminal code but applies to questions of both civil and criminal jurisdiction. *Cabazon Band of Mission Indians*, 480 U.S. at 207 n.5.

tribal jurisdiction do not depend on "the issuance of any patent" and clarified the sometimes confusing jurisdictional categories of "Indian country" and "Indian reservation" that were already in the process of being aligned in the early 1900s. See, e.g., *Donnelly v. United States*, 228 U.S. 243, 269 (1913) (Indian country encompasses reservation land regardless of whether Indian title has been extinguished). And the Supreme Court has repeatedly applied the 1948 Indian country statute to determine whether reservations allotted during the late 1800s and early 1900s retained their reservation status. E.g., *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464 (2020); *Seymour v. Superintendent*, 368 U.S. 351, 357–58 (1962).

B. *Reservation Status: The Standard for Diminishment*

The boundaries of the Oneida Reservation were established by the 1838 Treaty, and those boundaries can be changed only by Congress. The Oneida never agreed to any change in the treaty-established boundaries that were supposed to be "binding on the contracting parties," including the United States. Treaty with the Oneida, art. 5. Instead, the Village relies on *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903).

In *Lone Wolf*, several Indian tribes challenged a new statute opening up about two million acres of reservation land to non-Indian settlement. The tribes relied on a treaty provision for allotting such land that required signed consent by three-fourths of the adult male tribe members. The tribes alleged that the number of signatures was not sufficient and that the signatures actually obtained had been obtained by fraud.

The Supreme Court did not decide whether the federal government had complied with the treaty. Instead, in language that can be jarring for twenty-first century readers, the

Court held that Congress was free to pass legislation breaking treaties with Indians:

> The [tribe's contention that the treaty must be enforced] in effect ignores the status of the contracting Indians and the relation of dependency they bore and continue to bear towards the government of the United States. To uphold the claim would be to adjudge that the indirect operation of the treaty was to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians, and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act, if the assent of the Indians could not be obtained.

*Id.* at 564.

> The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy,

particularly if consistent with perfect good faith towards the Indians.

*Id.* at 566. *Lone Wolf* thus held that if Congress chose to break a treaty with an Indian tribe, the courts would allow it to do so without judicial remedy. See also *id.* at 565 ("It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race."), quoting *Beecher v. Weherby*, 95 U.S. 517, 525 (1877).

That harsh rule has been mitigated by what is in effect a strong clear-statement rule: Congress may exercise this power to break a treaty, but it must do so clearly, not by inference or indirection. Congressional intent to break its treaty pledges "is not to be lightly imputed." *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968). "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status *until Congress explicitly indicates otherwise*." *Solem*, 465 U.S. at 470 (emphasis added), citing *Celestine*, 215 U.S. at 285. Accord, e.g., *Nebraska v. Parker*, 136 S. Ct. 1072, 1078–79 (2016) ("Only Congress can divest a reservation of its land and diminish its boundaries, and its intent to do so must be clear.") (quotation marks and brackets omitted); *Celestine*, 215 U.S. at 290–91 (allotment act must "be construed in the interest of the Indian" to continue federal guardianship absent "clear" evidence of congressional intent). We will not "lightly assume that Congress in fact intends to undermine Indian self-government," *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 790 (2014), and must

"resolve any ambiguities in favor of the Indians." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 344 (1998).

Based on these principles of statutory construction, the framework for determining whether Congress has diminished a reservation has been "well settled." *Parker*, 136 S. Ct. at 1078. We first look to the statutory text, which provides the "most probative evidence of diminishment." *Id*. at 1079, quoting *Hagen v. Utah*, 510 U.S. 399, 411 (1994). Next, we look to whether the circumstances surrounding the legislation "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink." *Solem*, 465 U.S. at 471; see also *Parker*, 136 S. Ct. at 1080; *Wisconsin v. Stockbridge–Munsee Community*, 554 F.3d 657, 663 (7th Cir. 2009). Last, we consider the later demographic history and the United States' later treatment of affected areas, which have "some evidentiary value" and can "reinforce" a conclusion suggested by the text. *Parker*, 136 S. Ct. at 1081 (brackets omitted), citing *Solem*, 465 U.S. at 471, and *Mattz v. Arnett*, 412 U.S. 481, 505 (1973). Neither this court nor the Supreme Court has ever found the requisite congressional intent to diminish based on only this last factor.[4]

C. *Applying the Solem Diminishment Framework*

Applying the *Solem* framework shows that Congress has not expressed intent to diminish the Oneida Reservation, let alone done so clearly. Each time the Supreme Court has applied the *Solem* framework and found a reservation to be disestablished or diminished, a tribe-specific statute expressly

---

[4] We read *McGirt* as adjusting this framework by establishing statutory ambiguity as a threshold for any consideration of context and later history. 140 S. Ct. at 2468.

removed a definite portion from the reservation at the time of enactment. In each such case, that conclusion was dictated by statutory text or unequivocal contemporary understanding drawn from legislative history or negotiations in which the tribe agreed to give up part of its reservation.

The Village's theory departs from this framework in three important ways. First, the Village relies on a theory of incremental diminishment. Without a statute expressly removing a portion of the Oneida Reservation, the Village argues that Congress intended to diminish the Reservation to an unknown degree—and at many unknown points in the future—as allotted land would be passed into fee ownership by individual Indians and then sold to non-Indians parcel by parcel. Such a haphazard pattern of diminishment would produce an impracticable checkerboard pattern of state and Indian jurisdiction. The Supreme Court has rejected legal theories that would produce such checkerboards of tribal or state jurisdiction based on the identity of the fee owner. E.g., *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 479 (1976); *Seymour*, 368 U.S. at 358. The Village's theory also relies on the notion that reservation status depends on whether individual tribe members own the particular parcels. The Supreme Court has also rejected this theory repeatedly over the past century, beginning with *Celestine*.

Second, the Village relies on Congress's general expectation during the allotment era that Indian reservations and tribal identity would fade away as Indians embraced individual land ownership and assimilated. The Village presents none of the kinds of contemporary evidence that the Supreme Court or this court has found to be compelling evidence of

congressional intent to diminish. Congress's general expectation that allotment would lead to the end of the reservation system is simply not enough to establish diminishment. *Solem*, 465 U.S. at 468–69.

Third, the Village's theory is not limited to an act of Congress specifically addressing the Oneida Reservation—indeed, it is not even tied to the text of a statute.[5] Instead, the Village asks us to find congressional intent to diminish in the two generally applicable statutes that were used to allot many Indian reservations in the late 1800s. See Brief for National Congress of American Indians and Indian Land Tenure Foundation as *Amici Curiae* 26–27. The Village's argument that diminishment can result from Congress's general expectations regarding widely-applicable allotment statutes would lead to the conclusion that many other reservations—including at least one that the Supreme Court has held to be intact—have been diminished. See *Mattz*, 412 U.S. at 495, 505–06 (reservation allotted under the Dawes Act was not disestablished; land within reservation boundaries was still Indian country).

Having highlighted the key flaws in the Village's diminishment theory, we now consider each of the *Solem* factors. We see no evidence that Congress has acted to diminish the Oneida Reservation.

---

[5] The Village does argue that the 1906 Oneida Provision indicated congressional intent to diminish, but the bulk of its argument is devoted to the generally applicable Dawes and Burke Acts. And the same logic underlies both arguments for diminishment.

###### 1. *Statutory Text*

The Village correctly concedes that the relevant statutes—the 1887 Dawes Act, the 1906 Burke Act, and the 1906 Oneida Provision—lack hallmark language of diminishment. And it could not argue otherwise given the clear language of the statutes. Each statute moved members of the Nation toward individual ownership of Reservation land in fee, but none addressed the status of the Reservation or the underlying tribal interests in Reservation land. To provide a textual basis for diminishment, the statutes would have to contain "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests[, which] strongly suggests that Congress meant to divest from the reservation." *Solem*, 465 U.S. at 470, citing *DeCoteau v. District County Court*, 420 U.S. 425, 444–45 (1975); see also, e.g., *DeCoteau*, 420 U.S. at 445–46 (statute ratifying agreement with tribe to "cede, sell, relinquish, and convey" reservation land in exchange for a sum certain reflected congressional intent to disestablish the reservation); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597 (1977) (statute provided that tribe would "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in" part of reservation); *Hagen*, 510 U.S. at 412 (statute provided that certain lands were "restored to the public domain"); *Seymour*, 368 U.S. at 354 (statute provided that certain lands were "vacated and restored to the public domain"); *Yankton Sioux*, 522 U.S. at 344–45 (statute ratifying agreement with tribe to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" in exchange for a sum of money).

The statutes affecting the Oneida Reservation contain no such language surrendering all tribal interests in allotted land, so there is no textual basis for diminishment.[6]

2. *Historical Context and Contemporaneous Understanding*

We next look to historical context surrounding the enactment of the legislation. Even where a statute contains no hallmark diminishment language, *Solem* taught that a court may infer congressional intent to diminish reservation boundaries where sources "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." 465 U.S. at 471.

Such an understanding would likely be found either in the record of negotiations with the tribe ceding land or in the legislative history. See *id.* (describing as particularly useful "the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress"); *Yankton Sioux*, 522 U.S. at 351–52 (looking to legislative reports describing negotiation of a surplus land act); *Stockbridge–Munsee Community*, 554 F.3d at 664 (relying on shared expectations of tribe and United States expressed

---

[6] The Village argues that we should not expect cession or payment language to appear in allotment acts because that kind of language is tailored to the surplus land context. But we see no reason why Congress could not have used similar or analogous language in an allotment act to express its intent to diminish or disestablish a reservation. An allotment statute could say, for example, that reservation lines were abolished or modified. See Act of Apr. 21, 1904, ch. 1402, § 8, 33 Stat. 189, 218 ("[T]he reservation lines of the said Ponca and Otoe and Missouria Indian reservations … are … abolished.").

in contemporaneous legislative history). The Village has not offered this kind of contemporaneous evidence.

Instead, the Village bases its argument on the general expectation of Congress during the allotment era that the allotment policy would ultimately lead to assimilation and the disappearance of reservations. The Village asks us to hold that the Dawes Act, as amended by the Burke Act, diminished the Oneida Reservation because the "ultimate goal of allotment" was to do away with Indian reservations. We assume this was the ultimate goal, though the full story is complicated. See, e.g., *Montana v. United States*, 450 U.S. 544, 559 n.9 (1981) ("The policy of the Acts was the eventual assimilation of the Indian population … and the gradual extinction of Indian reservations and Indian titles.") (internal quotation marks and citations omitted). But whatever the ultimate aim of allotment may have been, the Village's argument is foreclosed by Supreme Court precedent.

Supreme Court decisions stretching over fifty years—from *Seymour*, to *Mattz*, to *Solem*, to *Parker*—have repeatedly rejected diminishment arguments that were based on evidence of that general understanding. In these cases, the Supreme Court held that surplus land acts passed by Congress during the allotment era did not diminish Indian reservations, even though Congress at the time had the general aim of bringing the reservation system to an end and expressly opened up part of the reservations to settlement by non-Indians.

The Court refused to infer from the general expectations of Congress the specific intent necessary to abrogate treaty rights. *Solem*, 465 U.S. at 468–69 (collecting cases); see also *Stockbridge–Munsee Community*, 554 F.3d at 662. Without more, offering non-Indians the opportunity to purchase land

within reservation boundaries does not diminish a reservation, regardless of what Congress may have expected to happen. *Solem*, 465 U.S. at 470; *Mattz*, 412 U.S. at 496–97. And while Congress expected that reservations "*could* be abolished" when "all the lands had been allotted and the trust expired," *Mattz*, 412 U.S. at 496 (emphasis added), this does not mean that reservations would *necessarily* be disestablished or diminished. Indeed, the Court observed in *Mattz* that "allotment under [a tribe-specific allotment act] is completely consistent with continued reservation status." *Id.* at 497.

The Village's incremental diminishment theory also depends on inferring congressional intent to diminish a reservation from its understanding that "a loss of reservation status was the necessary consequence of a change in land tenure on an allotment." Brief for Appellee 31**.** The Village argues that Congress must have intended the Reservation to be diminished as land ownership passed from Indians to non-Indians because, we are told, it viewed continued reservation status as incompatible with non-Indian land ownership. The Village traces this idea to dicta from *Solem* observing that "the notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century." 465 U.S. at 468.[7] That passing observation most definitely does not mean that the Supreme Court has accepted

---

[7] This observation about the understanding of reservation status—dicta in *Solem* (1984)—is in tension with the holding of *Celestine*, 215 U.S. at 285 (1909), that "reservation" had a broader meaning than "Indian country" and did not depend on Indian title:

[I]t was decided, in *Bates v. Clark*, 95 U. S. 204, 209 (1877), that all the country described in [the 1834 statute defining Indian country] as "Indian country" remains such "so long as the In-

non-Indian ownership as a basis for finding diminishment. After all, *every* surplus land act opened up reservation land for purchase by non-Indians, and *every* allotment act created the possibility that reservation land would at some point pass into the hands of non-Indians.

The Supreme Court explicitly rejected the Village's theory in *Seymour*. In that case, the State of Washington made essentially the same argument that the Village makes here: that the limits of the reservation "would be diminished by the actual purchase of land within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians." 368 U.S. at 357.

---

dians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress." … But the word "reservation" has a different meaning, for while the body of land described in the section quoted as "Indian country" was a reservation, yet a reservation is not necessarily "Indian country." The word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide, and, when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress.

*Solem* went to say: "*Only in 1948 did Congress uncouple reservation status from Indian ownership*, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries." 485 U.S. at 468 (emphasis added). This dictum is also inconsistent with *Celestine* (and the actual holding of *Solem*) and provides no support for the Village.

The Court concluded that the question was "squarely put to rest" by Congress's enactment of 18 U.S.C. § 1151, which defines "Indian country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent." *Id.* at 357–58. The "impractical pattern of checkerboard jurisdiction" that would result from the State's proposed rule was "avoided by the plain language of § 1151." *Id.* at 358. In other words, the Court deferred to the statutory language of § 1151(a) to determine that Indian title was not needed to maintain the reservation status of a parcel of land.[8] In *Seymour*, the Court refused to draw any distinction between patents issued to Indians and those issued to non-Indians, so its reasoning means that the passage of title from Indian to non-Indian does not show diminishment.

*Seymour*, *Mattz*, *Solem*, and *Parker* addressed surplus land acts that disposed of reservation land after a portion of it had been allotted to tribal members. We have no reason to approach allotment statutes differently. After all, allotment and surplus land disposition went hand-in-hand. Both were part of Congress's plan to encourage individual Indian ownership of property, assimilation, and the eventual end of the reservation system. See *Solem*, 465 U.S. at 468. The Dawes Act itself

---

[8] *Seymour* cited only the Indian country statute for this point, but *Celestine* supported the same conclusion long before the statute was enacted. See 215 U.S. at 285; supra at 23 n.7. The historical and revision notes to the Indian country statute also indicate that Congress included all reservation land—irrespective of Indian title—in the Indian country definition based on earlier Supreme Court precedent. See 18 U.S.C. § 1151 historical and revision notes to 1948 Act, citing among others *Donnelly v. United States*, 228 U.S. 243 (1913) (Indian country encompasses reservation land regardless of whether Indian title has been extinguished).

explicitly provided for disposal of surplus land after allotment had been carried out. § 5, 24 Stat. at 389. We see no reason why issuing fee patents to members of the Nation—or the subsequent alienation of the land—would necessarily result in diminishment if opening surplus lands to non-Indians would not have done so.[9]

If anything, the case for rejecting a piecemeal diminishment approach is even stronger in the allotment context than in the surplus land context. The surplus land acts at issue in *Seymour*, *Solem*, *Mattz*, and *Parker* put surplus reservation land on the market for immediate purchase by non-Indians. The Dawes and Burke Acts, on the other hand, only created the possibility that some parcels of land might—at some unknown times, perhaps decades later—pass into non-Indian hands.[10] Again, the Village's diminishment theory is contrary to a long line of precedent and the entire logic underlying the *Solem* framework.

To avoid the force of these lines of Supreme Court precedents, the Village asks us to follow the Eighth Circuit's analysis in *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010 (8th Cir. 1999). See also *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994 (8th Cir. 2010) (discussing *Gaffey*). To our knowledge, *Gaffey* is the only case in which a Court of Appeals has embraced an incremental theory of diminishment akin to the one proposed

---

[9] *McGirt* made this point clear: allotment is completely consistent with continued reservation status. 140 S. Ct. at 2465.

[10] This feature of allotment illustrates another fundamental flaw in the Village's incremental diminishment theory. How could we say that Congress *clearly intended* to do something (diminish the Reservation) when it had no idea when or to what extent the Reservation would be diminished?

by the Village. In *Gaffey*, the Eighth Circuit held that some land allotted under the Dawes Act had lost reservation status as its fee ownership passed to non-Indians. 188 F.3d at 1028; see also *Podhradsky*, 606 F.3d at 1003. But *Gaffey* is readily distinguishable from this case, and we are not persuaded it fits within Supreme Court precedents on diminishment, either before or after *McGirt*.

*Gaffey* is distinguishable because the Eighth Circuit made clear that the loss of reservation status there was effected by a surplus land act of 1894 that applied specifically to the Yankton Sioux: "the 1894 Act did not clearly disestablish the Yankton Sioux Reservation, but it intended to diminish the reservation by not only the ceded land, but also by the land which it foresaw would pass into the hands of the white settlers and homesteaders." 188 F.3d at 1028. Almost all of the statutory analysis focused on provisions of this later surplus land act, not the Dawes Act, and is therefore not applicable here, where the 1906 Oneida Provision did not contain similar provisions.

But to the extent that *Gaffey* relied on the Dawes Act and more generally on Congress's understanding of allotment and reservation status, we cannot reconcile it with the Supreme Court precedents discussed above.

First, citing Section 6 of the Dawes Act, *Gaffey* noted: "Some articles of the Act reflect the parties' assumption that an allottee who received full title at the end of the trust period would become subject to the civil and criminal laws of the State or territory in which he resided." *Id.*, citing 24 Stat. at

389–90.[11] The Eighth Circuit seems to have concluded from this provision that tribal and federal jurisdiction receded, thus furthering the diminishment argument. That conclusion is at odds with *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976). *Moe* held that Section 6 of the Dawes Act *did not* establish general state jurisdiction over Indians living on fee-patented lands, *id.* at 478–79, so Section 6 of the Dawes Act is not probative of diminishment. See also *Celestine*, 215 U.S. at 287 ("The [Dawes Act], which confers citizenship, clearly, does not emancipate the Indians from all control, or abolish the reservations."), quoting *Eells v. Ross*, 64 F. 417, 420 (9th Cir. 1894) (McKenna, J.); *United States v. Nice*, 241 U.S. 591, 600 (1916) (Dawes Act subjects allottees not to "all the laws of the state," but "only such as could be applied to tribal Indians consistently with the Constitution and the legislation of Congress").

Second, the Eighth Circuit considered that "nothing in its text or the circumstances surrounding its passage suggests that any party anticipated that the Tribe would exercise jurisdiction over non Indians who purchased land after it lost its trust status." *Gaffey*, 188 F.3d at 1028. The Eighth Circuit did not explain the connection between reservation status and jurisdiction over non-Indians, and the Village does not explain the connection here. We see no reason why reservation status would depend on jurisdiction over non-Indians. Nor do we

---

[11] The rest of the *Gaffey* opinion used the term "Act" to refer to the surplus land act specific to the Yankton Sioux, and this quoted sentence was embedded in analysis of that surplus land act. Either the court mistakenly believed that this provision was part of the surplus land act or the reasoning of the opinion did in fact rely in part on the Dawes Act. We assume the latter.

see why, given the Supreme Court's insistence on clear evidence of congressional intent to diminish a reservation, a statute would need to define affirmatively the scope of tribal jurisdiction in order to avoid diminishment and thereby to maintain reservation boundaries. Last, the theory of incremental diminishment embraced in *Gaffey*—in which individual parcels of land would be removed from the reservation as they passed into the hands of non-Indians—is at odds with *Seymour*, *Moe*, and the Supreme Court's hostility toward rules that would create checkerboard jurisdiction.

### 3. *The Oneida Provision of the 1906 Appropriations Act*

The Oneida Provision of the 1906 Appropriations Act adds nothing to the Village's analysis and does not establish that Congress acted to diminish the Oneida Reservation. The statute authorized the Secretary of the Interior "in his discretion, to issue a patent in fee to any Indian of the Oneida Reservation in Wisconsin for the lands heretofore allotted him." 34 Stat. at 381. It further provided that "the issuance of such patent shall operate as a removal of all restrictions as to the sale, taxation, and alienation of the lands so patented." *Id.* But this language just reiterated language from the generally applicable Burke Act that had been passed a month earlier. See 34 Stat. at 183. The Oneida Provision also authorized the Secretary to issue fee patents to 56 of the original 1,530 Oneida allottees before the end of their trust periods. 34 Stat. at 380–81. This provision was also not inconsistent with continued reservation status for allotted parcels. The surplus land cases teach that fee ownership of land—even by non-Indians—is not inconsistent with reservation status. The slight acceleration of the allotment process enabled by the Dawes and Burke Acts does not

even suggest, let alone clearly establish, that Congress intended to diminish the Reservation.[12]

The Village also argues that the Oneida Provision is comparable to another provision of the 1906 Appropriations Act that we determined had actually disestablished the reservation of the Stockbridge–Munsee Community. See *Wisconsin v. Stockbridge–Munsee Community*, 554 F.3d 657 (7th Cir. 2009). But the Stockbridge–Munsee provision called for the allotment of the entire reservation in fee simple. *Id.* at 664. Moreover, the plan for allotment of the Stockbridge–Munsee reservation was negotiated between the tribe and the United States, and the plan was intended to be "a full and complete settlement of all obligations" under the United States' treaty with the tribe. *Id*. This complete allotment in fee, language (from the allotment plan proposed by the tribe, not from the statute) providing for the settlement of all treaty obligations, and the history of the negotiated plan provided the basis for our conclusion that the reservation had been disestablished "[b]ecause the reservation could only be abolished if the tribal members held their allotments in fee simple." *Id.*, citing *Mattz*, 412 U.S. at 496.[13]

---

[12] The Village presents some evidence that some members of Congress and interested parties who sought access to Oneida land supported the 1906 Appropriations Act because it would accelerate the issuing of fee patents under the Burke Act. That evidence does not indicate that *Congress* intended to diminish the Reservation, however. The Village also tries to distinguish the Oneida Provision of the 1906 Appropriations Act from the Burke Act by pointing out that the former lacked the competency requirement of the latter. This difference is not material to the diminishment issue.

[13] Our reasoning in *Stockbridge–Munsee* seems to be in tension with *McGirt*. We concluded that the key act of Congress "included none of the

The terms and history of the Stockbridge–Munsee provision distinguished it "from most allotment acts." *Id.*; see also *id.* at 665 (Ripple, J., concurring) (emphasizing the "unique historical context" of the Stockbridge–Munsee provision). The Oneida Provision did not provide for immediate allotment in fee, and neither it nor associated materials said anything about settling all treaty obligations. Instead, the Oneida Provision left intact the trust process established by the Dawes Act and modified in the Burke Act. Our decision in *Stockbridge–Munsee* therefore does not support the Village's diminishment argument under the different statutory provision enacted in a different historical context.

### 4. *Post-Enactment History and Demographics*

The final factor in the *Solem* framework considers the United States' "treatment of the affected areas, particularly in the years immediately following the opening," and the later demographic history of the opened land. *Parker*, 136 S. Ct. at 1081, quoting *Solem*, 465 U.S. at 471. Post-enactment history is the "least compelling evidence" of diminishment, *id.* at 1082, and neither the Supreme Court nor this court has ever relied on this last factor alone to find diminishment. Indeed, *Solem* strongly suggests that post-enactment history may never be enough to establish congressional intent to diminish without

---

hallmark language suggesting that Congress intended to disestablish the reservation." 554 F.3d at 664. We did not identify an ambiguity in the text before concluding that "the circumstances surrounding the act show that Congress wanted to extinguish what remained of the reservation when it passed the act." *Id.* This approach is consistent with *Solem* but is in tension with the adjustments to the *Solem* framework made by *McGirt*.

evidence from statutory text or unequivocal contemporary understanding:

> When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.

465 U.S. at 472, citing *Mattz*, 412 U.S. at 505 ("A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."), and *Seymour*, 368 U.S. 351; see also *Parker*, 136 S. Ct. at 1081 ("[T]his Court has never relied solely on this third consideration to find diminishment."). Cf. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 605 (1977) (invoking subsequent history to support rejection of "strained" reading of statute). After all, subsequent events cannot tell us much about the intent of the Congress at the time of enactment. See, e.g., *Yankton Sioux*, 522 U.S. at 355; *Sullivan v. Finkelstein*, 496 U.S. 617, 631 (1990) (Scalia, J., concurring). In the absence of textual support or unequivocal contemporary evidence, inherently unreliable post-enactment history cannot by itself show the "clear intent" required to establish that Congress intended to abrogate a treaty, breaking the word of the United States and eroding Indian sovereignty.

Even if it were possible to infer clear congressional intent to diminish based only on later events, neither the United States' treatment of the Oneida land after the statutes' enact-

ment nor the demographic history of the allotted land provides compelling evidence of congressional intent to change the boundaries of the reservation.

First, the record of subsequent treatment of the Reservation is "mixed" and therefore provides no support for the Village's diminishment argument. See *Yankton Sioux*, 522 U.S. at 356. We need not describe in too much detail the vast record of this case to illustrate that the later treatment of the Reservation was, at the very least, inconsistent and is therefore not probative of congressional intent to diminish. See *id.* at 355–56 (declining to delve to deeply into the probative value of legislative and administrative materials where the record was mixed); *Solem*, 465 U.S. at 478 (subsequent treatment "of no help to either side" when "rife with contradictions").

The Village highlights statements from the Bureau of Indian Affairs indicating that the federal government lacked jurisdiction over allotted land that had passed out of trust and points to various federal references to the "former Oneida Reservation." Almost all this evidence comes from significantly after enactment of the relevant statutes. Moreover, the jurisdictional landscape following allotment was complicated, and Section 6 of the Dawes Act did subject allottees to *some* state jurisdiction after receiving fee patents, yet without diminishing the reservations. See *Moe*, 425 U.S. at 477–78. For this reason, the fact that Wisconsin exercised some jurisdiction over the land—and that the federal government largely did not—is not particularly informative.

The Nation points to 1909 correspondence by a Bureau of Indian Affairs agent who questioned whether the Village could be established by the state because there had been "no formal opening of surplus lands or obliteration of reservation

lines." The Nation also identifies reports of the Commissioner of Indian Affairs listing the Reservation as comprising the original 65,000 acres established by the 1838 Treaty. And the Nation points out that its own 1936 constitution—approved by the Bureau of Indian Affairs—described the territory of the Nation as extending "to the territory within the present confines of the Oneida Reservation." U.S. Dep't of the Interior, Office of Indian Affairs, *Constitution and By-Laws for the Oneida Tribe of Indians of Wisconsin*, art. I. The Nation contends that this can be understood only as a reference to the confines of the Reservation established by the 1838 Treaty because there was no other point of reference for the "present confines" of the Reservation. The Nation and Village each present more historical evidence to support their respective positions. But the historical record is too inconclusive to signal clear support for diminishment even if there were other support for that conclusion.

Second, the Village argues that the "extreme population shift" of the Reservation that led to the loss of Indian title to the "vast majority" of allotments supports diminishment. This is essentially an argument that the Reservation was diminished *de facto* by non-Indians moving into the contested territory. But this argument is contrary to and foreclosed by *Parker*, which explicitly rejected the theory of diminishment by extreme demographic shift. In *Parker*, the Supreme Court held that the relevant reservation was undiminished even though the Omaha had been "almost entirely absent from the disputed territory for more than 120 years," at which time the tribe did not assert jurisdiction on the land. 136 S. Ct. at 1081. By the time of the litigation, Omaha tribal members comprised fewer than two percent of the population in the contested territory. *Smith v. Parker*, 996 F. Supp. 2d 815, 828 (D.

Neb. 2014) (case in district court). But even this extreme demographic shift was insufficient to support diminishment. The demographic shift in the contested part of the Oneida Reservation, at least as represented by Village of Hobart census data, is notably less extreme.[14]

The demographic argument is also contrary to *Solem*—and fundamental principles of statutory interpretation—insofar as it suggests that a reservation may be diminished not by acts of Congress but by later events on the ground. The implications are troubling. It would mean that the United States could break its treaty obligations and lessen Indian sovereignty not because Congress expressed its intent to do so, but because non-Indian settlers were particularly effective in obtaining reservation land, sometimes by fraud or unfair dealing, or simply by taking advantage of Indian poverty.

---

[14] According to U.S. Census Bureau population estimates, as of July 1, 2017, the total Village population was 8,896, of which "White alone" residents comprise 79.9% and "American Indian and Alaska Native alone" comprise 12.2%. Considering later demographic changes in determining congressional intent might be entirely inappropriate—not just of limited value—in the context of allotment. Congress specifically intended to open up land for sale to non-Indians when it passed surplus land acts. But allotment was carried out with the purpose of assimilating Indians and encouraging them to become farmers, not specifically to wrest their land from them. See, e.g., Otis, supra, at 141 ("Individual land *ownership* was supposed to have some magic in it to transform an Indian hunter into a busy farmer.") (emphasis added). Alienation of allotted land was not necessarily expected, and the Village presents no compelling reason why demographic change following allotment is probative of congressional intent. The Village does not make the argument that Congress was acting in bad faith and intended Oneida allottees to lose their land by, for example, defaulting on mortgages.

D.  *McGirt v. Oklahoma*

This brings us to *McGirt v. Oklahoma*, decided by the Supreme Court while this appeal was pending. In *McGirt*, the Supreme Court addressed the Indian country status of the Creek Reservation in Oklahoma. That reservation was allotted with the agreement of the Creek in 1901. Congress allotted almost all of the Creek Reservation, with limits on the right of individual Creek members to alienate the land. 140 S. Ct. at 2463. A subsequent act—functionally similar to the Burke Act—eased these alienation restrictions and allowed the Secretary of the Interior to waive them. The allotment statute required the Nation to convey deeds granting "all right, title, and interest of the Creek Nation and of all other [Creek] citizens," and the Secretary then approved those deeds and "relinquish[ed] to the grantee … all the right, title, and interest of the United States" in the allotted land. *Id.* at 2492 (Roberts, C.J., dissenting).

The Creek tribal government's authority was also substantially eroded by various Acts of Congress around the turn of the twentieth century. Congress abolished the Creek tribal courts, required presidential approval of tribal ordinances, empowered the President to remove the principal chief of the tribe, directed the Secretary of the Interior to assume control over the Creek schools, and required Creek officials to turn over all "tribal properties" to the Secretary of the Interior. *Id.* at 2465–66 (majority op.).

The Court held that all of this was not enough to disestablish the Creek Reservation. In doing so, it adjusted the *Solem* framework—in which congressional intent to diminish could be inferred from unequivocal contextual sources even in the

absence of textual support—to a more textual approach consistent with statutory interpretation more generally. Only if the text of a specific statute were ambiguous would consideration of context and subsequent history be appropriate: "There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms. The only role such materials can properly play is to help 'clear up … not create' ambiguity about a statute's original meaning." *Id.* at 2469, citing *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). The *McGirt* Court found no textual basis for disestablishment in the allotment acts or later statutes eroding tribal sovereignty, so it held that the original reservation boundaries remained intact.

The Court held that the allotment of the Creek Reservation had no effect on reservation status because the statute implementing the allotment contained no hallmark language of diminishment. *Id.* at 2465 & n.5.[15] Relying on *Mattz* and *Seymour*, the Court reiterated that ownership of land by non-Indians was entirely consistent with continued reservation status. While allotment was the "first step" of the movement toward eliminating the reservation system, *id.* at 2468, it did not affect the "ultimate fate of the land's reservation status." *Id.* at 2465; see also *id.* at 2466 (statutes encroaching on tribal sovereignty "consistent with the Legislature's general practice of taking allotment as a first, not final, step toward disestablishment and dissolution").

---

[15] Even the language in the allotment act requiring both the Creek Tribe and the United States government to transfer "all right, title, and interest" in the land to the allottee was not enough to create a statutory ambiguity. *Id.* at 2463.

*McGirt*'s allotment analysis has turned what was a losing position for the Village into a nearly frivolous one. *McGirt* teaches that neither allotment nor the general expectations of Congress are enough to diminish a reservation. The Village has no argument for diminishment grounded in the statutory text. The statutes on which it relies only allow for the allotment of the Oneida Reservation or speed along the allotment process. No statutory text comes close to creating an ambiguity regarding diminishment of Reservation boundaries.[16]

E.  *Alternative Grounds for Affirmance*

The Village asks us to affirm the judgment of the district court for two additional reasons. First, it argues that the issue of disestablishment was decided in a 1933 case brought by individual Oneida tribal members and that issue preclusion prevents the Nation from arguing that such former fee land remains within the current boundaries of the Reservation. See

---

[16] In its response to the Nation's notice of supplemental authority citing *McGirt*, the Village provides no textual support for its diminishment argument. Instead, the Village just reiterates its reliance on the 1906 Oneida Provision. But as described above, the text of the 1906 Oneida Provision provides no evidence of congressional intent to diminish the Oneida Reservation. Consistent with continued reservation status, it granted certain allottees fee simple land patents and authorized the Secretary of the Interior to grant other allottees fee simple patents at his discretion. The Village asserts that *McGirt* "does not caution against reliance on extratextual sources for determining [c]ongressional intent where there is evidence that Congress's intent was to diminish the reservation." This is tautological and, to the extent it suggests that textual support of congressional intent is not needed, wrong. *McGirt* teaches that we may not rely on extratextual sources unless the text is at least ambiguous with respect to Congress's intent to diminish.

*Stevens v. County of Brown* (E.D. Wis. Nov. 3, 1933) (un-published decision). Second, even if the Reservation remains intact, the Village argues that "exceptional circumstances" warrant application of the Special Event Ordinance to the Nation and its Big Apple Fest.

We may affirm the district court judgment "on any ground supported in the record, so long as that ground was adequately addressed in the district court and the nonmoving party had an opportunity to contest the issue." *American Homeland Title Agency, Inc. v. Robertson*, 930 F.3d 806, 810 (7th Cir. 2019). However, we may not alter a judgment to benefit a party that did not file its own notice of appeal. *Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008), citing *McDonough v. Dannery*, 3 U.S. (3 Dall.) 188, 198 (1796), and *Morley Construction Co., v. Maryland Casualty Co.*, 300 U.S. 185, 191 (1937) (in the absence of a cross-appeal, appellee may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary"); see also *Richardson v. City of Chicago*, 740 F.3d 1099, 1101 (7th Cir. 2014).

But we will not unnecessarily police the sometimes blurry line between arguments that seek to expand the judgment and those that do not. Doubts about the scope of a judgment should be resolved against finding that the appellee's failure to file a cross-appeal forfeited his right to argue an alternative ground. *Wellpoint, Inc. v. CIR*, 599 F.3d 641, 650 (7th Cir. 2010); see also 15A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 3904 (4th ed. 1998 & supp. 2020) (uncertainties in applying the cross-appeal rule "suggest that the requirement should be administered with substantial flexibility"). This is particularly true where the underlying issue

is fully briefed and where considering the issue does not result in affirmance. See *JPMorgan Chase & Co. v. CIR*, 458 F.3d 564, 570 n.3 (7th Cir. 2006) (asserting jurisdiction over issue raised without cross-appeal by appellee in part because addressing the issue did not afford relief in favor of appellee).

### 1. *Issue Preclusion*

The Village argues that issue preclusion bars the Nation from arguing that the fee lands and roads on which Big Apple Fest took place were reservation land because it is bound by the judgment in *Stevens*. Issue preclusion prevents a party from relitigating issues resolved in a prior legal action. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). Issue preclusion applies based on a prior federal judgment when "(1) the issue sought to be precluded [was] the same as that involved in the prior litigation, (2) the issue [was] actually litigated, (3) the determination of the issue [was] essential to the final judgment, and (4) the party against whom estoppel is invoked [was] fully represented in the prior action." *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019), quoting *Matrix IV, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011) (alterations in *Calvert*).

In *Stevens*, a group of Oneida tribe members—"acting for themselves as well as for and on behalf of the members of the Oneida Tribe"—sued the Village for taxes assessed on reservation land and to enjoin future taxation. The district court held that allotment under the Dawes Act disestablished—or, in its words, discontinued—the Oneida Reservation, so Oneida tribal members residing within the bounds of the defendant-municipalities were subject to taxation. Importantly, the case was decided in 1933, before Congress passed the Indian Reorganization Act, before the Oneida Nation was

formed, and before the United States placed former fee land into trust under the authority of that Act for use by the Oneida.

The Nation and the Village disagree over whether applying issue preclusion would alter the judgment to the benefit of the Village. The Nation tells us that it would because holding the Nation to the *Stevens* judgment might call into question its ability to organize under the Indian Reorganization Act. This, in turn, could affect its ability to participate in the land-to-trust process that enabled the Nation to rebuild its land base, thereby implicating the Nation's authority over trust land. The district court awarded the Village declaratory relief that the Ordinance could be enforced "on those lands not held in trust by the United States for the benefit of the Nation." If our alteration of the judgment would render the Ordinance applicable to the Nation's trust land, it would expand the Village's rights under the judgment and further diminish those of the Nation.

We need not resolve definitively whether holding the Nation to the 1933 judgment would endanger the trust status of the parcels it acquired after the passage of the Indian Reorganization Act. The Nation does not describe precisely why this would be the case.[17] We see no need to draw precise

---

[17] We have reason to question the Nation's argument. The Interior Board of Indian Appeals has in the past noted—in response to an argument made by the Village—that the Nation would have been under federal jurisdiction in 1934 even if the Nation were not in occupation of a reservation. *Village of Hobart v. Midwest Regional Director*, 57 IBIA 4, 32, 46 n.27 (2013). And before the district court, the Nation argued the opposite of what it does on appeal, citing the Indian Reorganization Act. See 25 U.S.C. § 5108 ("The Secretary of the Interior is hereby authorized … to acquire …

bounds of the district court's judgment and the judgment that would result from affirming on issue preclusion. The decision to file a cross-appeal can be difficult, comes with high stakes, and must be made quickly. An appellee risks forfeiting potentially meritorious arguments for affirmance by improperly filing a cross-appeal, see *Weitzenkamp v. Unum Life Insurance Co. of America*, 661 F.3d 323, 332 (7th Cir. 2011), and has at most two weeks beyond the usual appeal period to decide whether it will file a cross-appeal. Fed. R. App. P. 4(a)(3). Because the enlargement of the judgment is debatable and the question of issue preclusion is easily resolved in the Nation's favor, the better course is to reach it and hold that the Nation is not bound by the *Stevens* judgment.

We can begin and end our analysis on the element of representation. Our baseline presumption is that non-parties are not bound by earlier judgments. "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008), quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); see also *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971). In "limited circumstances," non-parties may be adequately represented in litigation and bound by a judgment, *Richards v. Jefferson County*, 517 U.S. 793, 798

---

any interest in lands … *within or without existing reservations* … for the purpose of providing land for Indians." (emphasis added)); see also *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) (trust land counts as "validly set apart" land for tribal immunity purposes even if it is not formally within the bounds of an established reservation), citing *United States v. John*, 437 U.S. 634, 648–49 (1978).

(1996), such as where the non-party controlled the earlier litigation or where there is a privity relationship. *Nat'l Spiritual Assembly of Bahá'ís of the U.S. Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Bahá'ís of the U.S., Inc.*, 628 F.3d 837, 849 (7th Cir. 2010) (in the preclusion context, "'privity' has come to be 'seen as a descriptive term for designating those with a sufficiently close identity of interests'"), quoting *Tice v. American Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998); see also 18A Wright & Miller, supra, § 4451.

Here, the Nation was not a party to the earlier litigation. The Village contends that the *Stevens* plaintiffs were acting on behalf of the Nation itself. In particular, the Village highlights the involvement of William Skenandore—a tribal leader who described himself as Presiding Chief of the Oneida—and language in the complaint indicating that the plaintiffs were "duly authorized and empowered to act for and on behalf of the Oneida Tribe of Indians of the State of Wisconsin." But this action was not *brought* on behalf of the Nation. The caption indicates that the named plaintiffs were acting on behalf of *members* of the Oneida tribe. The complaint further specified that this referred to members of the tribe who owned Reservation land on which they were paying taxes and stated that the action was brought to recover taxes paid by those individuals.

The interests the landowner-plaintiffs in *Stevens* sought to advance were distinct from the interests of the sovereign Nation that had entered into the 1838 Treaty with the United States of America. See *Richards*, 517 U.S. at 802 (distinguishing between corporate interests of municipality and individual interests of municipal taxpayers). After all, Indian tribes are "domestic dependent nations" exercising "inherent sovereign

authority." *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788 (2014), quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*, 498 U.S. 505, 509 (1991). Individual tribal members could not adequately represent the interests of the sovereign Nation in preserving the scope of its sovereignty. Because the *Stevens* plaintiffs were not adequate representatives of the Nation, the Nation cannot be bound by the earlier judgment.

### 2. *Exceptional Circumstances*

The Village also argues that, even if the Reservation has not been diminished, "exceptional circumstances" warrant application of the Special Event Ordinance to the Big Apple Fest. The general rule is that state or local regulation of tribes on reservations is preempted by federal law. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987). This doctrine is grounded in "traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development." *Id.* (quotation marks omitted). Under "exceptional circumstances," however, "a State may assert jurisdiction over the on-reservation activities of tribal members." *Id.* at 215, quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331–32 (1983).

Most of the reasons the Village provides to justify its regulation of the Nation were not properly raised, so we will not consider them. In its brief, the Village briefly recites—largely without citation to authority or substantive development—arguments made before the district court. To the extent that these arguments are perfunctory and undeveloped on appeal, they are forfeited. *Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017). And in the absence of a cross-appeal, we will not

consider any ground for affirmance that would expand the judgment beyond the Oneida fee land. *Richardson*, 740 F.3d at 1101.

This leaves us with one remaining argument: that Indian tribes cannot assert immunity from state and local land use regulations, including the Ordinance, when those regulations are applied to fee land on a reservation. The Village cites *Brendale v. Confederated Tribes and Bands of the Yakima Nation*, 492 U.S. 408 (1989), and Justice Stevens's dissent in *City of Sherrill v. Oneida Nation of New York*, 544 U.S. 197 (2005). Neither supports the Village's position.

*Brendale* held that Indian land-use regulations will not, under certain circumstances, apply to fee land when that land is owned by non-Indians. 492 U.S. at 444–45 (opinion of Stevens and O'Connor, JJ.). A limitation on tribal jurisdiction over non-Indians tells us nothing, however, about state jurisdiction over the Oneida.

In *City of Sherill*, Justice Stevens noted in dissent that exceptional circumstances would warrant the application of local land-use regulations on Indian-held land where "a small number of Indian-held properties arranged in checkerboard fashion," given the "balance of interests" between the locality and the Indian tribe. 554 U.S. at 226 n.6. But this was just an observation about how the fact-intensive exceptional circumstances test might apply under a specific set of circumstances. It did not suggest a per se rule that Indian fee land should be subject to state regulation.

The Village has not argued that the Oneida fee land at issue is checkerboarded with non-Indian land such that uniform regulation is necessary to advance state interests. Nor

has it explained why the balance of tribal and state interests would merit a departure from the general rule that the state may not assert jurisdiction over Indians on reservations. See *Cabazon*, 480 U.S. at 216. There may be circumstances in which isolated fee land may be subject to local regulation, but the Village has presented no reason to believe that such circumstances are present here.

\* \* \*

The Oneida Reservation defined by the 1838 Treaty remains intact, so the land within the boundaries of the Reservation is Indian country under 18 U.S.C. § 1151(a). The judgment of the district court is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of the Oneida Nation.